**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**


**GAIL CROWE, AS THE ADMINISTRATRIX OF THE**
**ESTATE OF CLETUS ROWLAND, DECEASED, AND**
**ON BEHALF OF HER HEIRS AND BENEFICIARIES**          **PLAINTIFF**

**v.**                                        **No. 3:17-cv-00171-MPM-RP**


**GGNSC RIPLEY, LLC D/B/A GOLDEN LIVING CENTER**
**RIPLEY; GGNSC ADMINISTRATIVE SERVICES, LLC;**
**GOLDEN LIVING; GOLDEN-LIVING CENTER, GOLDEN LIVING    DEFENDANTS**


## <u>ORDER</u>

This cause comes before the court on the motion of defendant GGNSC Ripley LLC

("GGNSC") to compel arbitration, pursuant to Section 4 of the Federal Arbitration Act ("FAA").

*See* 9 U.S.C. § 4.  Plaintiff Gail Growe, as the Administratrix of the Estate of Cletus Rowland,

has responded in opposition to the motion, and the court, having considered the memoranda and

submissions of the parties, concludes that the motion is well taken and should be granted.

This is a nursing home neglect case, but, at this juncture, the sole issues which are being

litigated involve the question of whether it should be referred to binding arbitration. The instant

motion to compel arises out of arbitration provisions signed by Plaintiff Crowe on behalf of her

mother Rowland, when she was admitted to GGNSC's nursing home in Ripley on two occasions

in 2008 and 2011. This motion requires this court to interpret and apply the standards set forth by

the Fifth Circuit regarding informal agencies authorizing an individual to sign an arbitration

contract on behalf of a relative being admitted to a nursing home.

This subject matter is a familiar one to this court, and it has previously written about it at length, with considerable clarifications from the Fifth Circuit. Most recently, in an order denying a nursing home's motion to compel arbitration in *Gross v. GGNSC Southaven, LLC,* this court made an *Erie*-guess that the Mississippi Supreme Court would require a formal legal device, such as a power of attorney or conservatorship, in order for a nursing home resident to authorize a relative to sign an arbitration contract on her behalf. *Gross*, 83 F. Supp. 3d 691 (N.D. Miss. 2015).[1] The Fifth Circuit disagreed, making its own *Erie*-guess that the Mississippi Supreme Court would recognize informal, verbal agencies in this context. *See Gross v. GGNSC Southaven, L.L.C.,* 817 F.3d 169, 175 (5th Cir. 2016).

This is this court's first motion to compel arbitration since the Fifth Circuit's opinion in *Gross*, and it will accordingly take this opportunity to make some observations regarding the current state of the law in this field. Importantly, the Fifth Circuit in *Gross* appeared to find that, even if this court's reading of the Mississippi Supreme Court's intentions *vis a vis* nursing home arbitration were correct, that state court would likely lack the authority under *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) to require powers of attorney in the specific context of nursing home arbitration. Specifically, the Fifth Circuit wrote that "[t]o require a 'formal legal device[ ] such as a power of attorney' specifically for arbitration agreements and other 'important contracts' is in tension, at the very least, with *Concepcion*, which disapproved of nominally neutral rules that, in practice, 'would have a

---

[1] The nursing home in *Gross* happened to be GGNSC, which is likewise the defendant in this case.

disproportionate impact on arbitration agreements.'"  *Gross,* 817 F.3d at 178, citing *Concepcion*, 563 U.S. at 342, 131 S.Ct. 1740.

This court regards the Fifth Circuit's reliance upon *Concepcion* in *Gross* as quite significant, since it casts doubt upon the Mississippi Supreme Court's basic authority to interpret state law in a manner which, in the Fifth Circuit's judgment, unduly burdens the pro-arbitration policy considerations undergirding the Federal Arbitration Act.  This is quite significant in the nursing home arbitration context, since it is difficult to overlook the fact that while the Fifth Circuit has broadly supported arbitration in nursing home cases, the Mississippi Supreme Court has repeatedly rejected, in unanimous decisions, informal agency arguments made by nursing homes in arbitration cases.  *See, e.g. Mississippi Care Center of Greenville, LLC v. Hinyub*, 975 So.2d 211 (Miss. 2008); *Adams Community Care Center, LLC v. Reed*, 37 So.3d 1155 (Miss. 2010), *GGNSC Batesville, LLC v. Johnson,* 109 So.3d 562 (Miss. 2013).

In light of these and other decisions, it seems clear that the Mississippi Supreme Court regards nursing home arbitration with far more skepticism than the Fifth Circuit does, and this places Mississippi district courts in the difficult position of attempting to reconcile the views of two appellate courts which seem to have significant differences of opinion on this issue.  It is for this reason that this court regards the Fifth Circuit's reliance upon *Concepcion* as so important, since *Concepcion* essentially represents the federal law "trump card" over what would otherwise simply be a matter of state contract law.  Thus, the fact that the Fifth Circuit has invoked *Concepcion* in this context suggests that, even if the Mississippi Supreme Court were to make its view unmistakably clear that informal agencies to sign nursing home arbitration contracts were invalid under state law, there would be considerable doubt, in the Fifth Circuit's view, regarding

its authority to so interpret state law. As a federal district court, this court is, of course, answerable to the Fifth Circuit, and it will therefore put aside its own reading of the Mississippi Supreme Court's intent in this context and simply apply the Fifth Circuit's holding in *Gross*.

Having said that, this court considers it important to note that it has already recognized one very important limitation on the Fifth Circuit's decision in *Gross*, namely that it did not address the crucial question of mental competency in nursing home arbitration cases. In an order issued shortly after the Fifth Circuit's decision in *Gross*, this court requested briefing from the parties in another nursing home arbitration case on its docket, in order to solicit their views regarding *Gross*'s impact in that case. In its briefing order in *Jackson v. GGNSC,* 2016 WL 1104492 (N.D. Miss 2016), this court wrote as follows:

> This court requests that, in submitting their revised briefing, the parties address an issue which was not raised by the plaintiff and accordingly was not addressed by the Fifth Circuit in *Gross*, namely that of mental competency. The Mississippi Supreme Court has not, to date, endorsed verbal agencies allowing an individual to sign a nursing home arbitration agreement on behalf of a relative, but, now that the Fifth Circuit has issued an *Erie*-guess that it would do so, this court considers it important to consider the competency requirement that would apply in this context. The execution of contracts requires that both parties have the mental capacity to contract, and it strikes this court that there will frequently be concerns surrounding mental competency when an elderly resident asks a relative to sign an arbitration agreement on his behalf, since this seems to suggest at least some level of diminished capacity. The Mississippi Supreme Court has written that the test for competency to contract is "whether a person could know or understand his legal rights sufficiently well to manage his personal affairs." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1131 (Miss. 2014), *citing Rockwell v. Preferred Risk Mut. Ins. Co.,* 710 So. 2d 388, 391 (Miss. 1998).

*Jackson*, 2016 WL 1104492 at *2.

While this court thus expressed its view in *Jackson* that nursing home residents would frequently lack the mental competency to authorize a relative to sign an arbitration contract on their behalf, it also expressed concerns that the mental competency issue might serve to limit the

4

applicability of the Fifth Circuit's ruling in *Gross* more than it intended. Specifically, this court wrote that:

> Having said that, this court has some doubts regarding whether it was the Fifth Circuit's intent to have its opinion in *Gross* apply as seldom as it likely would if the *Hixson* standard is applicable. In the court's view, if an elderly resident has sufficient mental capacity to "know or understand his legal rights sufficiently well to manage his personal affairs" then why would he need to authorize a family member to sign an arbitration contract for him in the first place? He could seemingly just sign it himself. Indeed, the competency standard which this court applied in *Howorth* is essentially the same as the *Hixson* standard, and requiring an elderly resident to meet the same standard to either sign an arbitration contract himself or to authorize a relative to sign it would, at least arguably, render the Fifth Circuit's decision in Gross somewhat irrelevant. This court certainly does not wish to do that; yet, at the same time, it is required to apply Mississippi law. Mississippi law appears to have a rigorous competency standard for contracts, and is the informal agency authorized by the Fifth Circuit in Gross not a contract?

*Id.* at 5-6.

Significantly, in responding to this court's briefing order in *Jackson*, GGNSC appeared to concede that Mississippi's traditional mental competency standards would, in fact, apply to informal agencies. Indeed, in its brief on remand in *Gross*, GGNSC wrote that:

> While it is true that the recognized test for determining mental capacity in Mississippi is "whether or not a person is able to manage the ordinary affairs of life," *Shippers Express v. Chapman*, 364 So. 2d 1097, 1100 (Miss. 1978), the burden is on the Plaintiff in this instance to first prove that Ms. Wagner was insane or not capable of providing consent to contract when she granted him actual authority to act on her behalf. As adults age, it is not uncommon for them to ask their adult children to handle financial, medical, or similar matters for them. The mere fact that an elderly individual could have, but chose not to, take certain actions on their own behalf is not indicative, in and of itself, that they were unable to do so because of some mental incapacity. It is the Plaintiff's burden, not Defendants, to prove that Ms. Wagner was incompetent when she granted Plaintiff authority to act as her agent. Unless the Plaintiff meets this burden, Ms.Wagner's competency is presumed.

[*Gross*, 3:14cv37, docket entry 108 at *9]. GGNSC thus appeared to agree that Mississippi's traditional mental competency standards apply in this context, although it argued that a plaintiff

has the burden of proving lack of mental competency to enter into an informal agency.  This court tends to agree, since it is the general rule that the "law presumes the fact of sanity and mental capacity to contract, and the burden is upon the party seeking to avoid an instrument on the ground of insanity or mental incapacity of the maker thereof to establish it by a preponderance of proof." *Hamilton Bros. Co. v. Narciese*, 158 So. 467, 470 (1935).  This court will likely apply that general rule in the nursing home arbitration context, barring some indication from the Mississippi Supreme Court or the Fifth Circuit that it should do otherwise.

Having made some observations regarding the current state of nursing home arbitration law in this circuit, this court will now proceed to a discussion of the instant case.  This court has arguably discussed the issue of mental competency more than it needed to here, since the plaintiff Crowe concedes that her mother, Ms. Rowland, had the requisite degree of mental competency to create an informal agency on her behalf.  Specifically, plaintiff writes in her brief that:

> *Citing Estate of Jackson v. GGNSC Batesville, LLC*, 2016 U.S. Dist. LEXIS 38313 (N.D. Miss. 2016), Defendants anticipate and rebut a competency argument. Plaintiff does not contend that Ms. Rowland lacked competence to bestow her daughter with authority to act. To the contrary, Ms. Rowland was quite competent and specifically delegated the level of authority she wished Ms. Crowe to possess, and it did not include the authority to bind Ms. Rowland to arbitrate her claim.

[Plaintiff's brief at 1].

In the court's view, the fact that plaintiff concedes at the outset that her mother had the mental competency to execute an informal agency distinguishes this case from some of the more troubling nursing home arbitration cases it has encountered.  For example, this court has tried cases in which defendants have argued that residents who lack a basic awareness of reality have

waived their right to a trial by jury or to have authorized a relative to do so. In *Liberty Health & Rehab of Indianola, LLC v. Howarth*, 11 F.Supp.3d 684, 687 (N.D. Miss. 2014), for example, this court found, following a bench trial on the mental competency issue, that a nursing home resident who signed a nursing home arbitration contract lacked the competency to do so, based upon proof demonstrating, among other things, that, at the time he signed the arbitration agreement, he was unaware of what year it was. In this case, by contrast, plaintiff's concession on the mental competency issue leaves this case squarely within the scope of the Fifth Circuit's decision in *Gross*, and this court's task is simply to determine whether Rowland created an informal agency authorizing her daughter to sign an arbitration contract on her behalf. This court will presently turn to this issue, and, in so doing, it makes sense to begin with the Fifth Circuit's opinion in *Gross*.

Following *Gross*, informal verbal agencies essentially take their place (at least in federal court) alongside powers of attorney and conservatorships as vehicles through which legal authority to sign an arbitration contract on behalf of another may be transferred under Mississippi law. One important difference is that, while powers of attorney and conservatorships each have a well-established body of law delineating their scope, there remains considerable uncertainty regarding exactly how broadly or narrowly the Fifth Circuit will choose to interpret the scope of informal agencies for the purpose of signing arbitration contracts. This court has a considerable number of nursing home arbitration cases on its docket, and it will therefore attempt to provide its best guess regarding the scope of such agencies, both for the purposes of this case and others as well. This court regards it as important to do so, since, in light of the Fifth Circuit's ruling, informal agencies will likely be asserted by nursing homes in a large number of

arbitration cases. Indeed, informal agency now appears to be one of the few potentially winning

arguments which nursing homes have in arbitration cases where they rely upon a signature of a

relative. That is, the Fifth Circuit in *Gross* rejected the other arbitration theories raised by

defendant in that case, and (as noted by this court in its opinion in *Gross*) nursing homes have

had very little success with any of the theories which they have raised at the Mississippi Supreme

Court.

In considering the unsettled issues in this context, this court will begin with the language

of the Fifth Circuit's opinion in *Gross*. In its opinion, the Fifth Circuit made it clear that verbal

instructions may be sufficient to create an agency to sign an arbitration contract on behalf of a

nursing home resident and that no formal written document is required in this regard.

Specifically, the Fifth Circuit wrote in *Gross* that:

> Under Mississippi law, an agent's '[a]ctual authority may be express or implied.'"
> *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d
> 491, 500 (5th Cir. 2009) (*quoting Migerobe, Inc. v. Certina USA, Inc*., 924 F.2d 1330,
> 1336 (5th Cir. 1991)). "It is deemed express if granted in either written or oral specific
> terms." *Id*. According to the Restatement (Third) of Agency, which Mississippi courts
> consult, see id., "[a]ctual authority . . . is created by a principal's manifestation to an
> agent that, as reasonably understood by the agent, expresses the principal's assent that the
> agent take action on the principal's behalf." Restatement (Third) of Agency § 3.01
> (2006). From the foregoing, this court has previously concluded that "[i]t is clear . . . that
> the authority to enter a contract may be conveyed orally and that no formal writing is
> required as a general rule of Mississippi law." *Northrop Grumman*, 575 F.3d at 500.

*Gross*, 817 F.3d at 177.

In addition to authorizing verbal agencies in this context, the Fifth Circuit in *Gross* also

endorsed utilizing the deposition testimony of an alleged agent to establish the existence and

scope of his agency. Specifically, the Fifth Circuit wrote that:

> [U]nder Mississippi law, actual authority exists when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) Of Agency § 2.01. It follows that the agent's testimony is competent evidence of actual authority because the agent will usually be the best positioned to testify about his belief at the time he acted. Moreover, the Mississippi Supreme Court has stated in dicta that "[i]n Mississippi, agency and the scope thereof may be proved through the testimony of the agent alone." Eaton v. Porter, 645 So. 2d 1323, 1326 (Miss. 1994). Thus, Gross's sworn testimony is competent evidence on the question of Gross's agency and its scope.

*Id.* at 179.

Based upon the foregoing, the Fifth Circuit in *Gross* framed the issues for this court's resolution on remand as whether the nursing home "has in fact established (1) that Gross had express authority to act on his mother's behalf and (2) that the power to execute an arbitration agreement—that is, the power to relinquish legal rights, in addition to the power to handle medical or financial circumstances—was within the scope of that authority. *Id.* at 180. The Fifth Circuit provided important clarification of this standard in footnote 4 of its opinion, where it wrote that:

> Actions are within the scope of an agent's authority if they are "designated or implied in the principal's manifestations to the agent" or are "acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act." Restatement (Third) Of Agency § 2.02(1). The Restatement explains that "the consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts," such as when acts "create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal." Id. § 2.02 cmt. h.

*Id.* at 180, n. 4. The *Gross* parties settled before this court had an opportunity to apply these standards on remand, but they appear to be very much relevant in this case, and both sides have addressed them in their briefing.

This court now turns to the parties' specific arguments regarding whether plaintiff had actual authority to sign an arbitration agreement on behalf of her mother in this case. As to this issue, the parties' positions essentially come down to what may be regarded as a crucial point of semantics, as it relates to the meaning of the word "necessary" in this context. In her deposition, defendant's employee Alisha James, who dealt with plaintiff's mother during her mother's 2008 admission, appeared to agree with the characterization of plaintiff's counsel that Rowland had indicated that she only granted her daughter the authority to make health care decisions and to sign the documents "necessary" to gain admission to the nursing home. For her part, plaintiff also testified that she thought "you had to sign all them papers to get her admitted," [plaintiff's depo. at 27] and she argues in her brief that her agency was, in fact, limited to signing documents "necessary" to gain admission.

In the court's view, the problem with the use of the term "necessary" in this context is that it is susceptible to two different meanings, which this court will call the "loose" and "legalistic" constructions of the word. Under the loose meaning of the word "necessary," plaintiff allegedly had the authority to sign documents which were, in a general sense, associated with admission to the nursing home. Under the legalistic meaning of the term, plaintiff was only authorized to sign documents which were strict legal prerequisites for admission. This is a crucial distinction in this case, since all parties agree that, as was prominently stated on the top of the arbitration agreement in this case, it was not a precondition for admission to the nursing home.

Seizing upon this fact, plaintiff argues in her brief that:

Gail Crowe is Cletus Rowland's daughter. Doc. 7-14, Deposition of Gail Crowe, p. 12 (hereafter Crowe Dep.). She executed all of the admissions documents surrounding Ms. Rowland's two admissions to Defendants' facility, one in 2008 and one in 2011. She was quite clear about the scope of her authority to sign for her mother. She had authority to make health decisions for her mother and to sign documents necessary for her admission to health-care providers, but anything beyond that decision-making required specific consultation with her mother. This delineation is pronounced in her deposition testimony.

Defendants' lawyer questioned Ms. Crowe about various documents she signed during the two admissions. She executed one such document as "legal representative" and was asked why she did so. Crowe Dep. at 23. She responded "Because we just signed for mother. She shakes a lot. … And she just left it up to us to sign." Crowe Dep. at 23:24-24:2. Counsel then inquired, "Okay. So she left her health decisions up to you to decide what to do?" and Ms. Crowe responded, "Yeah. Well I didn't do nothing behind her back." Crowe Dep. at 24:3-12. In other words, Ms. Rowland empowered Ms. Crowe to execute documents necessary to obtain health care, but that ability was carried out in consultation with Ms. Rowland. This was confirmed by Ms. Crowe's testimony that her mother "was the one making her healthcare decisions at that time, … but she was allowing [Ms. Crowe] to do that on her behalf to some extent…." Crowe Dep. at 35:11-17. See also Crowe Dep. at 38:21-39:3; 44:7-18. Simply put, Ms. Crowe was "the person who was mainly in charge of making [her] mother's health care decisions" because her mother gave her that authority. Crowe Dep. at 64:21-65:5.

Thus, the most that can be said of Ms. Crowe's authority to act on behalf of her mother is that she could make health care decisions and could execute documents necessary to admit Ms. Rowland to the nursing home. And, Ms. Crowe was also clear that her intent was to remain within that limited authority. When asked if she remembered signing a particular document, she stated, "When I went there, they started handing me papers. I was constantly signing … Cause I thought you had to sign them all to get her admitted. … I had no idea." Crowe Dep. at 27:17-23. Further questioning made it even more clear that Ms. Crowe was led to believe she was only executing documents that were necessary for admission and nothing else. Crowe Dep. at 72:33-73:6; 81:20-82:9.

[Plaintiff's brief at 3-5].

After considering the parties' argument and the record in this case, this court can discern at least five reasons why plaintiff's reliance upon the legalistic meaning of the word "necessary" is not well taken. First, this court notes that counsel for plaintiff has made repeated efforts to

interject the term "necessary" into this case, which necessarily diminishes its basic relevance here. For example, James testified under questioning from plaintiff's counsel that:

> Q. In terms of a representative, you had discussions with [Ms. Rowland] as well?
> A. Yes.
> Q. And tell me about that discussion.
> A. She explained that her son or daughter could complete admission paper work.
> Q. Admission paper work meaning documents that were necessary for admittance to Golden Living?
> A. Correct.
> Q. Did Ms. Rowland indicate that her son or daughter had any extra authority to do anything else?
> A. No, she did not.

[James depo. at 16]. Thus, James testified, when choosing her own words, that Rowland had authorized her daughter to "complete admission paper work." In the court's view, this language is consistent with the "loose" meaning of the term "necessary," in the sense that it covers documents which are merely associated with being admitted, whether they were legal pre-requisites for admission or not. It appears that, in his questioning, plaintiff's counsel sought to steer James into a more legalistic meaning of the term, and, while she agreed with his characterization, it clearly carries less force than if she had chosen the word "necessary" herself.

Later in her deposition, James again chose the word "admission paper work" to describe the scope of the agency, and plaintiff's counsel (over objection) again appeared to steer this testimony into one of strict legal necessity:

> Q. Okay. Do you recall having any discussion with Mr. Robertson, Cole Robertson, about this particular family, like who's got authority to sign what?
> A. Yes. After meeting with the patient, I explained to him, the family, the son/the daughter, Ms. Rowland had said that either one of them would be coming to do her admission paper work.
> Q. Was it your understanding that it was just the necessary documents for her to be admitted to the facility?
> Mr. Phillips: Object to form.

A. Yes.
Q. Nothing extra other than the bare minimum to get her into the facility?
Mr. Phillips: Object to form.
A. Yes.

[James depo. at 24]. This court is not, by any means, faulting plaintiff's counsel for attempting to vigorously litigate this case on behalf of his client. Indeed, some may argue that this line of questioning is simply good lawyering. Regardless, in calling balls and strikes in this case, this court has its own obligation to recognize when a particular batter is crowding the plate, and that appears to be the case here. In the court's view, the fact that plaintiff's counsel repeatedly sought to steer the testimony in this case into a discussion of legal "necessity" considerably reduces the impact of any helpful testimony which he was able to elicit.

The second reason this court rejects the legalistic interpretation of the term "necessary" is that it is in conflict with the known facts of this case. In the court's view, some of the most important evidence relating to the scope of plaintiff's authority to sign for her mother is her testimony that the *reason* for the agency was the fact that her mother's hands shook, thereby making it difficult for her to sign documents. Clearly, this testimony casts serious doubt upon plaintiff's attempts to now argue that her agency only authorized her to sign documents which were, in a legalistic sense, necessary to gain admission to the nursing home. As quoted above, plaintiff testified that "we just signed for mother. She shakes a lot. … And she just left it up to us to sign." [Plaintiff's depo. at 23-24]. Obviously, Ms. Rowland's hands would not have been any steadier if she had been asked to personally sign documents, such as arbitration agreements, which were not preconditions to admission to the nursing home. The question thus arises how

13

plaintiff's agency to sign on behalf of her mother could have been limited in the manner she now

suggests, and she offers no satisfactory clarification of this issue in her briefing.

A third, and related, reason why the legalistic definition of the term "necessary" seems

inapplicable in this case lies in the fact that plaintiff admittedly signed other documents which

were part of the admission process, even though they were not legal preconditions for admission.

As noted by defendant in its briefing:

> 20. In her Response Crowe identified specific instances where Ms. Crowe
> allegedly spoke to her mother about the Beauty and Barber Shop Services as well as the
> Immunization forms, indicating that this was evidence that the authority granted to Ms.
> Crowe was specific, not general. However, Crowe failed to identify any specific
> conversation regarding the Authorization for Assignment of Benefits Form or the
> Informed Choice form, both of which Ms. Crowe admits she signed on behalf of her
> mother based on the authority granted to her. This is because, as Ms. Crowe noted, she
> was given permission to sign ALL documents on behalf of Ms. Rowland. Doc. #7-14 at
> pg. 80-82.

[Brief at 8].   The record supports defendant's arguments in this regard.

In her briefing, plaintiff emphasizes her testimony that she specifically discussed certain

documents with her mother and that the decision whether or not to sign them was made by

Rowland, and not her.  For example, with regard to a flu vaccine authorization which the nursing

home asked her to sign during Rowland's first admission in 2008, plaintiff testified that:

> Q: Do you remember signing this document back in 2008?
> A: Refuse.  That's the flu vaccine.
> Q: Why did you refuse the flu vaccine?
> A: She said she didn't want it?
> Q: So she told you that she didn't want the flu vaccine?
> A: That's right.
> Q: So you signed this on behalf of her?
> A: I did.
> Q: Do you know why she didn't want the flu vaccine?
> A: She took the flu shot years and years ago and got sick.

14

[Plaintiff's deposition at 21].  In the court's view, while it is true that plaintiff testified that her mother specifically authorized (or refused to authorize) the signing of certain documents, her attempt to thereby establish that the agency was limited to the signing of documents necessary to gain admission to a nursing home is less than persuasive.  This is particularly true considering that plaintiff also signed, following no apparent discussions with her mother, documents which were not required for admission.

From this court's reading of plaintiff's deposition, there appears to be no clear demarcation between the sort of documents which plaintiff decided to discuss with her mother before signing and those which she did not.  Indeed, it appears that plaintiff and her mother simply took greater interest in some documents, such as those relating to immunizations and beauty and barber shop services, which seemed likely to have a practical impact upon her daily life at the nursing home.  This is entirely understandable on a human level, but it cannot be reasonably held against the nursing home that arbitration contracts are, by their very nature, dry and legalistic documents to which many individuals pay scant attention.  Once again, plaintiff acknowledged that she signed certain other legalistic documents which were not a precondition to admission to the nursing home, even though she could not specifically recall having done so. For example, plaintiff testified that:

> Q: Do you recall signing this document? This is a form choice required signature document.[2]
> A: No.
> Q: Okay.  Is that your signature at the bottom?
> A: It is.
> Q: Okay.  But you don't recall signing it?

---

[2] This court presumes that the term "form choice" in the deposition transcript refers to the "informed choice" form.

A: Not offhand I don't.
Q: This is your signature?
A: It is.
Q: Under here it says legal representative, is that correct?
A: Uh-huh (affirmative response).
Q: Okay. Why did you sign as legal representative?
Mr. Gee: Object to form. Go ahead.
A: Because we just signed for mother. She shakes a lot.

[Plaintiff's depo. at 23]. As noted previously, plaintiff's testimony that "we just signed for mother" because "[s]he shakes a lot" casts serious doubt upon her attempts to now adopt a highly legalistic approach to this issue, and her acknowledgement that she signed other documents which were not preconditions for admission raises further doubts in this regard.

A fourth reason why the legalistic meaning of the term "necessary" is off point in this case arises from the language of the arbitration agreement itself. The parties agree that the arbitration agreement which bears plaintiff's signature specifically states at the top, in bold capitalized letters:

### RESIDENT AND FACILITY ARBITRATION AGREEMENT (NOT A CONDITION OF ADMISSION – READ CAREFULLY)

In light of this clear and prominent title, the question arises as to why plaintiff would have signed an agreement which so clearly stated that it was "not a condition of admission" if her agency was limited to signing documents which were, in fact, preconditions to admission. Indeed, it is difficult to discern how GGNSC could have been any clearer that signing the arbitration agreement was *not* a precondition to admission, and the fact that plaintiff signed it anyway casts considerable doubt upon her present argument that her agency was so limited. This argument appears to be, to a large extent, a position advanced by plaintiff's counsel that, while clever, is

based upon a quite selective reading of the proof in this case. Frankly, the plaintiff cannot overcome the disconnect between this argument and the known facts in this case.

The fifth and final reason why his court finds the loose definition of the term "necessary" to be correct lies in the fact that it simply seems more plausible in light of common experience of how trusted family members act in such situations. Indeed, it seems quite implausible that a mother who customarily had her daughter sign a wide variety of documents would have, during a stressful nursing home admissions process, seen fit to provide specific instructions regarding the legalistic scope of her agency to sign admissions documents. There is no evidence in the record that any such specific conversations took place, and it would be surprising if there were. It strikes this court that plaintiff's counsel is attempting to fill this void with his own characterization of the proof. Obviously, arguments of counsel are not evidence in this case.

In light of the foregoing, this court concludes that plaintiff's testimony that she signed a wide variety of documents for her mother based upon her physical limitations supports a conclusion that the agency in this case was a quite broad one. This testimony further casts doubt upon plaintiff's attempts to now argue that the agency was limited to signing documents which were necessary to gain admission to a nursing home. Once again, plaintiff testified that she signed a wide variety of documents for her mother, and yet they only discussed *some* of the documents she signed. It thus appears that plaintiff believed that the informal agency granted her the discretion to decide which documents involved issues about which her mother should be consulted and which documents should simply be signed without consultation. It seems likely that the Fifth Circuit would conclude that such an arrangement among trusted family members fell within the scope of its decision in *Gross*. Indeed, this court notes that, after the signing of

17

the arbitration documents in this case, Rowland did, in fact, grant a power of attorney in favor of plaintiff, which supports a conclusion that she enjoyed her mother's full trust and confidence.

In the court's view, any testimony by plaintiff that she signed the documents required to gain admission to the nursing home is simply ordinary English language used to describe the fact that she signed things for her mother as a general matter and that, consistent with this practice, when her mother decided she needed to be admitted to a nursing home, she signed the documents associated with gaining that admission. The arbitration agreement was, in fact, associated with that admission to the nursing home, even if it was not strictly required to gain admission. If plaintiff's mother had specifically told her that she should only sign documents which were legally required to gain admission to the nursing home, then she would have presumably testified to this effect in her deposition. Plaintiff did not so testify. Indeed, there is not even a hint in plaintiff's deposition testimony that the scope of the agency had been established in such fine detail, and this notion is flatly contradicted by her testimony that she (and other relatives) simply signed documents for her mother as a general matter, based upon her physical limitations.

In the court's view, the broad nature of the agency in this case is tacitly acknowledged by plaintiff's briefing. For example, plaintiff writes in her brief that:

> Ms. Rowland empowered Ms. Crowe to execute documents necessary to obtain health care, but that ability was carried out in consultation with Ms. Rowland. This was confirmed by Ms. Crowe's testimony that her mother "was the one making her healthcare decisions at that time, … but she was allowing [Ms. Crowe] to do that on her behalf to some extent…." Simply put, Ms. Crowe was "the person who was mainly in charge of making [her] mother's health care decisions" because her mother gave her that authority.

[Plaintiff's brief at 4 (record citations omitted)]. In the court's view, plaintiff's assertion that she was "mainly" in charge of her mother's health care decisions but that this power was exercised in

18

"consultation" with her mother is simply another way of saying that the scope of the agency in this case was not established in any sort of fine detail. This court believes this sort of tacit, informal agency to be typical among trusted family members, who generally feel no need to specifically state the scope of their trust in one another. From reviewing the record, it appears that the agency in this case was a very informal one which arose out of Rowland's simple trust in her daughter to act in her best interests. Such an agency is simply not consistent with plaintiff's efforts to now argue that it had been limited to matters which were strictly required for admission to the nursing home.

In light of the foregoing, this court concludes that plaintiff's signature of the arbitration agreement in this case fell within the scope of her authority since it involved an "act[] necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act" within the meaning of the Fifth Circuit's opinion in *Gross*. Moreover, in determining that the agency in this case encompassed "the power to relinquish legal rights" within the meaning of *Gross*, this court deems it significant that plaintiff acknowledged that she did, in fact, sign the arbitration agreement in this case, which clearly had that effect. While plaintiff could not specifically recall signing the agreement or discussing it with her mother, it seems clear that she did, in fact, sign it. Moreover, plaintiff made clear in her deposition that "I didn't do nothing behind her back," [Plaintiff's depo. at 24], which suggests that she believed at the time that she had the authorization to sign the documents.

While this court acknowledges that the proof regarding the scope of the agency in this case is less than compelling, it seems likely that the Fifth Circuit would require a lesser degree of

proof that a trusted family member (as plaintiff clearly was) was authorized to act on behalf of a nursing home resident than in cases where an unrelated third party was involved. In reaching this conclusion, this court proceeds from the premise that the Fifth Circuit likely intended for its opinion in *Gross* to find application in a considerable number of nursing home arbitration cases in which family members sign on behalf of relatives. If this were not the case, then the *Gross* decision would, in all likelihood, merely give rise to a large degree of litigation while generally reaching the same result (i.e. a finding of lack of agency) as if a formal power of attorney had been required. It seems unlikely that the Fifth Circuit intended to create such a judicially-inefficient manner of reaching the same result.

Proceeding from that premise, if courts were to require the same degree of proof among trusted family members as they did when unrelated third parties are involved, then it seems likely that *Gross* would only find application in rare cases. Indeed, GGNSC appears to concede that *Gross* would not apply at all in cases where the plaintiff is able to prove that the nursing home resident lacked the basic mental capacity to create an agency. This reduces the scope of the decision very considerably at the outset, given the prevalence of dementia and similar illnesses among nursing home residents.[3] Moreover, this court's experience is that proof of agency is typically weak when trusted family members are involved, largely because the trust which family members have in each other to act in their best interests is something which is simply understood

---

[3] According to the National Center for Health Statistics, 50.4% of nursing home residents have been diagnosed with Alzheimer's or other dementias, and it seems likely that the percentage of mentally incompetent residents is much higher in cases which proceed to litigation regarding whether the resident created a lawful agency for a relative to sign an arbitration agreement on their behalf. *See* http://www.cdc.gov/nchs/fastats/alzheimers.htm.

among them and is not explicitly stated. Under these circumstances, it seems unlikely that most family members would feel the need to expressly state the scope of any agency they were creating to sign documents on their behalf.

Moreover, even in cases where the nursing home resident did provide explicit verbal instructions regarding the scope of agency, it seems likely that many plaintiffs will have selective memories in this regard, consistent with their litigation interests. Indeed, relying upon plaintiffs to explicitly testify that they had full authorization to sign an arbitration agreement will generally require them to testify against their litigation interests. Inevitably, some plaintiffs will be reluctant to do so. Finally, even assuming that a plaintiff does testify in good faith, being admitted to a nursing home is typically a stressful and trying experience, and it seems unlikely that considering the dry legalistic language of an arbitration agreement factors high in the list of family concerns at the time of admission. Thus, this appears to be an issue to which most individuals will pay scant attention even at the time of signature, and their recollection will, inevitably, be much weaker (and potentially selective) years later in a deposition.

Considering the inherent nature of nursing home arbitration litigation, making a reliable determination regarding the implied agency doctrine will require district courts to surmount considerable weaknesses in the proof and, potentially, the candor of witnesses. Candidly, the difficulties which are inherent in trying to decipher, after the fact, the scope of any alleged informal agency was a principal reason why this court believed that the Mississippi Supreme Court would require a formal power of attorney in this context. *See Gross*, 83 F. Supp. 3d at 704 (observing that "[b]y requiring a formal legal device such as a power of attorney, the Supreme Court takes these issues out of the realm of subjective and often disingenuous arguments of

deceit and into the realm of clear and verifiable contractual language."). As noted previously, this court also interpreted the fact that the Mississippi Supreme Court had repeatedly rejected the implied agency arguments raised by nursing homes in arbitration cases as an indication that it would likely do so in future cases as well.

If this court's decision in *Gross* had been affirmed, then this case would be quite easy, and it seems doubtful that the motion to compel arbitration would have been filed at all. Nevertheless, the Fifth Circuit disagreed with this court's approach in *Gross*, and its duty now is to apply the law as established by that court. Based on the foregoing considerations, it appears likely that the Fifth Circuit would determine that the agency in this case fell within the scope of the implied agency doctrine as set forth in *Gross*. Defendant's motion to compel arbitration [7-1, 16-1] will therefore be granted, and this case is hereby stayed pending arbitration.[4]

SO ORDERED, this the 17th day of July, 2018.


/s/ Michael P. Mills
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

---

[4]This court notes that staying an underlying federal lawsuit pending arbitration is a procedure which has been expressly endorsed by the Fifth Circuit in cases where a motion to compel arbitration has been granted. *See e.g. Green Tree Servicing, L.L.C. v. Charles*, 872 F.3d 637, 639 (5th Cir. 2017). *See also Green Tree Servicing, L.L.C. v. Dove*, 701 F. App'x 385, 386 (5th Cir. 2017). As noted by the Fifth Circuit in *CitiFinancial Corp. v. Harrison*, 453 F.3d 245, 251 (5th Cir. 2006), this practice "pushes this case to arbitration quickly, foregoing delay while the merits are considered on appeal." This practice is also consistent with 9 U.S.C.§ 16(a)(1)(B), which only mentions denials, not grants, of motions to compel arbitration as serving as the proper subject of an immediate appeal.